### HYLO v. MICHIGAN SURETY COMPANY.

1. INTOXICATING LIQUORS—CIVIL DAMAGE—LIQUOR LICENSEE'S BOND —PARTIES—ADULT CHILD.

Under provisions of statute conferring a right of action upon "every wife, husband, child, parent, guardian or other persons who shall be injured in person or property" by an intoxicated person to whom principal under bond provided intoxicating liquor, a 29-year-old woman, dependent upon her father for support was entitled to maintain an action for his death as his "child" (Act No. 8, § 22, Pub. Acts 1933 [Ex. Sess.], as amended by Act No. 281, Pub. Acts 1937).

2. SAME—INJURY BY INTOXICATED PERSON—PARTIES—OTHER PERSON.

Under provisions of statute conferring a right of action upon "every wife, husband, child, parent, guardian or other persons who shall be injured in person or property" by an intoxicated person to whom principal under bond provided intoxicating liquor, the term "other persons" was intended to include all persons so injured (Act No. 8, § 21, Pub. Acts 1933 [Ex. Sess.], as amended by Act No. 281, Pub. Acts 1937).

3. SAME—SALES—INTOXICATION—EVIDENCE.

In adult child's action against surety on bonds of two liquor licensees, evidence amply established that both licensees had sold intoxicating liquor to the person who killed plaintiff's father with his car during seven-hour period preceding the death and that such person was thoroughly intoxicated by the time he took his car out on highway.

4. SAME—SALES TO INTOXICATED PERSON—GREAT WEIGHT OF EVIDENCE.

Verdict specially finding that both of defendant surety company's principals had sold liquor to the intoxicated person who killed plaintiff's father while yet intoxicated *held*, not against great weight of the evidence.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 30 Am. Jur., Intoxicating Liquors, § 634.

5. SAME—INJURY TO PROPERTY OR MEANS OF SUPPORT—EVIDENCE.
   Where evidence showing that plaintiff was 29 years old, the
   mother of an illegitimate 9-year-old boy, was supported by
   her widowed father for whom she kept house as well as work-
   ing out, and received the bulk of her support from her father,
   question as to whether or not she was injured in property or
   means of support by reason of father's death through negli-
   gence of intoxicated person to whom defendant surety's princi-
   pals, as liquor licensees, had sold intoxicating liquor while
   such person was intoxicated was properly submitted to jury
   and its verdict was not contrary to the great weight of the evi-
   dence in such respect.

Appeal from Alger; Runnels (Herbert W.) J.
Submitted October 12, 1948. (Docket No. 39, Cal-
endar No. 44,191.) Decided November 12, 1948.

Action by Josephine Hylo against Michigan Sure-
ty Company for damage suffered when her father
was negligently killed by a person who had been
served liquor by defendant's principals. Verdict
and judgment for plaintiff. Defendant appeals. Af-
firmed.

*George S. Baldwin* and *Roscoe W. Baldwin,* for
plaintiff.

*Shields, Ballard, Jennings & Bishop,* for defend-
ant.

BOYLES, J. The plaintiff, Josephine Hylo, brought
this suit against the defendant Michigan Surety
Company to recover damages claimed to have been
suffered by reason of the wrongful killing of her
father, Martin Hylo, October 7, 1944, by an automo-
bile driven by one Virgil Wright while Wright was
in an intoxicated condition. It is conceded that
Wright was intoxicated at the time of the accident,
that he negligently operated his automobile on the
wrong side of a public highway, ran into and injured

Martin Hylo causing his death. The defendant surety company is the surety on the statutory bonds of two different tavern keepers duly licensed to sell intoxicating liquors on the premises. The plaintiff, claiming that she had been injured in her property and means of support by reason of the negligent killing of her father and the loss of his wages and contributions, brought suit against said defendant as surety on the bonds of the two tavern keepers who are alleged to have unlawfully sold the intoxicating liquor to Virgil Wright which caused or contributed to his intoxication and the resulting damages.

The case was tried by jury which returned a verdict of $4,250 for the plaintiff. From the judgment entered thereon the defendant appeals. The questions urged for reversal involve the construction of certain statutes.

The provisions of the so-called civil damage act[*] on which plaintiff relies for recovery of damages, in so far as they apply to the instant case, are as follows:

"Every wife, husband, child, parent, guardian or other persons who shall be injured in person or property, means of support or otherwise, by an intoxicated person by reason of the unlawful selling, giving or furnishing to any such persons any intoxicating liquor, shall have a right of action in his or her name against the person who shall by such selling or giving of any such liquor have caused or contributed to the intoxication of said person or persons or who shall have caused or contributed to any such injury, and the principal and sureties to any bond given under this law shall be liable, severally and jointly, with the person or persons selling, giving or furnishing any spirituous, intoxicating or malt liquors as aforesaid.  *  *  *

---

[*] Act No. 8, § 22, Pub. Acts 1933 (Ex. Sess.), as amended by Act No. 281, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 9209-37, Stat. Ann. 1947 Cum. Supp. § 18.993).

"As a .condition precedent to the approval and granting of any license, and annually thereafter, the following persons shall make, execute and deliver to the commission a bond or bonds, * * * in the following amounts:

"1. * * *

"2. * * * Retailers of spirits for consumption on the premises, a bond or bonds in the sum of not less than $5,000 nor more than $10,000, in the discretion of the commission, conditioned that any such retailer or specially designated merchant will not directly or indirectly, by himself, his clerk or agent or servant at any time sell, furnish, give or deliver any alcoholic liquor to a minor except as provided in this act, nor to any adult person whatever who is at the time intoxicated, and that he will pay all damages actual and exemplary that may be adjudged to any person or persons, including those hereinafter mentioned, for injuries inflicted upon him or them either in person or property or means of support or otherwise, by reason of his selling, furnishing, giving or delivering any such alcoholic liquor."

The bonds which were furnished by the defendant surety company for the two tavern keepers involved were each in the sum of $5,000, and a part of the conditions in each bond was as follows:

"Now THEREFORE THE CONDITIONS OF THIS OBLIGATION is such that if the principal shall well and truly keep and perform all and singular the terms and conditions of his contract of license and/or permit or permits, and any modifications thereof, * * * and

"CONDITIONED FURTHER, that if the said principal will not directly or indirectly, by himself, his clerk, agent or servant at any time sell, furnish, give or deliver any alcoholic liquor to a minor, nor to any adult person who is at the time intoxicated, and that if the said principal will pay all damages, actual and exemplary that may be adjudged to any person or persons for injuries inflicted upon such person or persons either in person or in property or means of

support or otherwise, by reason of the said principal, selling, furnishing, giving or delivering any such alcoholic liquor, then this obligation shall be void; otherwise to remain in full force and effect."

The three questions urged by appellant for reversal are (1) Does the act confer upon an adult daughter a cause of action for the death of her father caused by an intoxicated person, (2) Under the act, must the plaintiff, in order to recover damages from the surety, prove that there was an unlawful sale of intoxicating liquor—*i.e.*, a sale to a person who was intoxicated at the time of such sale, and (3) Was the verdict contrary to the great weight of the evidence.

(1) The plaintiff was 29 years of age. The statute gives a right of action for damages to "every * * * child * * * *or other persons* who shall be injured in person or property, means of support or otherwise." The appellant claims that this should be construed as if it read, "every * * * *minor* child;" and that therefore it does not confer a right of action on an adult "child." We do not so construe the statute. The plaintiff, although an adult, is still the child of her father, Martin Hylo. It is conceded that Martin Hylo was Josephine Hylo's father, and it follows that she is his child. Furthermore, appellant ignores that part of the act which gives a right of action for damages to "other persons" who shall be injured in person or property, means of support or otherwise. Conceding, *arguendo*, that the plaintiff is not the "child" of her father, Martin Hylo, it would necessarily follow that she came within the designation of an "other person," under the express wording of the statute. The statute does not limit the right of action to the named persons, or to such persons as might be legally dependent on Martin Hylo for support.

"Under the statute giving a right of action to 'every wife, child, parent, guardian, husband, *or oth-*

*er persons,'* injured by an intoxicated person, the words *'or other persons'* were intended to cover *all* persons so injured." *Flower* v. *Witkovsky* (syllabus), 69 Mich. 371.

See, also, *Clinton* v. *Laning,* 61 Mich. 355; *Eddy* v. *Courtright,* 91 Mich. 264; *In re Miller's Estate,* 160 Mich. 309; *Heikkala* v. *Isaacson,* 178 Mich. 176, 181 (50 L.R.A.[N.S.] 857); *Butzin* v. *Bonk,* 303 Mich. 522.

(2) It is conceded that Virgil Wright was intoxicated when he fatally injured Martin Hylo, shortly before 10 o'clock in the evening of October 7, 1944. One Ted Compton testified that a little after 3 o'clock in the afternoon of said day Virgil Wright, together with said Compton, his cousin, went to "Baij's" tavern and that Wright drank "about 2 whiskeys and * * * about 2 or 3 beers" while there; that Wright and Compton then went to the other one of said taverns, the "Corktown Bar," where Wright consumed "2 or 3" drinks, either beer or whiskey, before Compton left shortly before 5 o'clock; that Virgil Wright remained in said tavern, in a booth, and was in "Baij's" tavern when Compton returned to that tavern about 7 o'clock in the evening. At that time Wright's car was still parked at the same place he had left it, about 3 o'clock, when he and Compton first went to Baij's tavern. At about 7 or 7:30, Compton testified, Virgil Wright was standing at the bar in Baij's tavern. Compton testified:

"*Q.* Did he give any indication of being under the influence of liquor at that time?

"*A.* It seemed he was drinking a lot more than he was then. You would know he was drinking. He did not invite me up to the bar for a drink."

Compton also testified that after he left the first tavern (about 5 o'clock) he went home. He said:

"*Q.* Where did you say you went after you left the tavern?

"*A.* After I left the tavern I went home.

"*Q.* That was after the accident?

"*A.* No. After the accident that was when what's his name took me home.

"*Q.* After you left the tavern you each had 8 or 9 drinks?

"*A.* Yes. ·

"*Q.* You would feel 8 or 9 drinks would influence a man like Virgil or yourself?

"*A.* I don't know. I would say he was a long ways from being drunk.   *   *   *

"*Q.* Would you say he was sober?   ·

"*A.* No."

Another witness testified that Virgil Wright was still in Baij's tavern drinking, around 9 o'clock. He testified:

"I would say around 9 o'clock. I saw Virgil Wright at the bar. Some soldier was with him. I do not know who the soldier was. I had drinks at the bar there. There was nothing occurred there. We only had a drink, I know that. I think Virgil bought me a drink. He called me over to the bar. He was standing at the bar as I was walking down through.   *   *   *

"*Q.* Who paid for these 3 drinks?

"*A.* I imagine we all paid for 1. Virgil paid for 1. I paid for 1. Jim Moore paid for 1. These drinks were served by the bartender. I don't know who was the bartender. I stayed there about three quarters of an hour, then I went to the Brown Derby. Virgil Wright did not go with me. I left him at the bar.   *   *   *

"*Q.* What condition was Virgil in at that time?

"*A.* Virgil had been drinking is all I can tell you.

"*Q.* Would you say he was intoxicated at that time? I don't mean dead drunk.

"*A.* No, but you could tell he was drinking."

Virgil Wright was sworn and testified. He said:

"October 7, 1944, the night Martin Hylo was killed, I was in Munising that day. I came to Munising about 1:30. I went to Ted Compton's place first (his cousin). We went to Baij's and had a few drinks. I bought some of the drinks and he did also. We had about half a dozen I guess. They were whiskey. I felt those drinks a little bit. From Baij's tavern we went to the Corktown. I do not remember who the bartender was at Baij's. I recall others I was drinking with that afternoon. They were strangers to me. This was on Saturday. It was quite a busy place then. At the Corktown I do not recall who the bartender was there. I purchased some drinks there. I think Ted purchased some drinks there. We were together, drinking together. There were two guys from the Soo with us there too. At the Corktown I had I would say about half a dozen drinks. I don't know what happened after that. I do not remember going to Baij's after that. I do not remember drinking with Mr. and Mrs. Robert McDonald at Baij's in the evening. I do not remember being at Baij's.

"*Q.* What happened at the Corktown?

"*A.* Well I don't know what happened for I just passed out there. I do not remember getting into my car that night. The last I remember is when I was at the Corktown bar. The next I remember something was Sunday morning when the officers were talking to me. I still felt those drinks when the officers were talking to me. I spent that Saturday night in jail there. I did not have any drinks before I went to the Corktown, I mean to Baij's. At Baij's was my first drink. I did not have any bottle of whiskey or liquor on me. I do not remember of drinking out of any bottle that day. * * *

"*Q.* Did you have any beer that afternoon?

"*A.* I think I had some.

"*Q.* You had some. Are you sure you had any whiskey?

"*A.* That is all I drank mostly was whiskey.

"*Q.* About what time was it when you ceased drinking?

"*A.* Well I don't know exactly what time it was. If I was refused liquor even at the Corktown I wouldn't remember that."

The evidence amply establishes that both tavern keepers sold intoxicating liquors to Virgil Wright after 3 o'clock and before 10 o'clock p.m. on the day in question, and that he was thoroughly intoxicated before 10 o'clock. One Walter Murk, the bartender at Baij's tavern, testified:

"I am employed at Baij's tavern and was on October 7, 1944. I recall some of the events of that evening. I have been a bartender about five years. As a result I think I have become able to recognize an intoxicated person. That is a part of my business. I went to work on October 7th at 4 o'clock in the afternoon and worked until 1 o'clock the next morning. During that period of time I had seen Virgil Wright in the Baij tavern. He attempted to buy liquor from me while he was in the tavern. I refused to sell him because he had enough, sufficient."

Appellant is the surety on the bonds of both tavern keepers, with a maximum liability of $5,000 on each bond. Apparently for the reason that the judgment against the defendant surety company is less than $5,000, the defendant does not raise any question as to which of the two tavern keepers, if either one, violated the statute. Whether either, or both, did so is a question of fact. The court in a proper charge submitted the question of fact to the jury, whether or not either tavern, or both, made an illegal sale of intoxicating liquor to Virgil Wright while he was intoxicated. The jury found specially that both tavern keepers were guilty of furnishing intoxicating liquor to an intoxicated person. The verdict is not against the great weight of the evidence in that regard.

(3) Nor do we find that the verdict is against the great weight of the evidence wherein the jury found that the plaintiff had been injured in "property, means of support or otherwise" by reason of the death of her father caused by the negligence of Virgil Wright while intoxicated. Josephine Hylo, 29 years old, never married, was the mother of an illegitimate child about 9 years old. Her father, about 60 years old, provided them with a home. His wife was deceased, they lived with him in his home and Josephine kept house for him, as well as working out. She had never instituted any proceedings to compel support of her child by its father,* hence she had the burden of the boy's support. Martin Hylo was steadily employed, for several years earning an average of over $2,000 each year. He maintained the home, and turned each pay check over to Josephine, retaining $5 from each for "spending money." He told her to pay the expenses and keep the rest for herself. She did so, and out of her father's wages maintained a home for herself and son, paid for groceries, fuel, clothing, taxes, water and other expenses, and saved a considerable sum for herself. Her father was in good health. She testified that she had to use her father's wages to run the house, support herself and the boy, because she did not earn enough to do so; that after his death she was compelled to use his accumulated earnings for support.

There was ample testimony to take to the jury the question of fact, whether the plaintiff was injured in property, or means of support. The verdict was not contrary to the great weight of the evi-

---

* 3 Comp. Laws 1929, § 12910 (Stat. Ann. § 25.451).

dence in that respect. The judgment is affirmed, with costs to appellee.

BUSHNELL, C. J., and SHARPE, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.